IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

FILED
SEP 23 2011
CLERK, U.S. DISTRICT COURT
NORFOLK, VA

FELICIA D. TENNESSEE,

Plaintiff,

v.

Civil Action No.: 2:10cv167

MURPHY-BROWN, L.L.C.,

Defendant.

**FINAL PRETRIAL ORDER**

In conformity with Rule 16 of the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the Eastern District of Virginia relating to pre-trial procedure, it is ORDERED that:

## I. STIPULATIONS

### A. The Parties Hereto Agree Upon a Stipulation with Respect to Certain Undisputed Facts as Follows:

1. Venue and jurisdiction are proper.

2. Plaintiff began working for Defendant in 1997.

3. The last day Plaintiff worked for Defendant was January 31, 2008.

## II. EXHIBITS

### A. Depending upon the evidence offered by Defendant in defense of this action, the following may be offered by Plaintiff at the trial of this case:

| Trial Ex. No. | Description | Defendant's Objections |
|---|---|---|
| P/1 | Supervisor Reviews Recommending Felicia Tennessee for Promotion<br>a. Recommendation from Duke Allebaugh dated | Relevance; multiple documents improperly combined as a single document; hearsay; prejudice outweighs probative value.<br>Objection granted |

| Trial Ex. No. | Description | Defendant's Objections |
|---|---|---|
| | April 18, 2004<br>b. Recommendation from Russell dated August 5, 2005 | [handwritten: Objection overruled] |
| P/2 | Felicia Tennessee Pay Rate Increase | Relevance; hearsay; prejudice outweighs probative value. [handwritten: Objection overruled] |
| P/3 | Warrant of Arrest and Guilty Plea of Hernandez Salvador Rodriguez | Relevance, hearsay, prejudice outweighs probative value; [handwritten: Defer to trial judge] |
| P/4 | Notes Regarding Tampering with Karen Winfield's Underwear<br>a. Note from Karen Winfield<br>b. Note from Josh Haitez | Relevance; hearsay; prejudice outweighs probative value; authenticity (Defendant can stipulate that the note was found in Defendant's files and is an authentic copy of such note, but has no information either way as to whether the note is what it purports to be or whether the statements made in the note are accurate). [handwritten: *Note: p4.a authenticity objection withdrawn] [handwritten: * Defer to trial judge] |
| P/5 | Notes from Fairfield Psychological Associates Regarding Felicia Tennessee's Condition | The exhibit is not described with specificity, and Defendant cannot ascertain which records are proposed to be included; in the absence of proper expert and opinion testimony as to the medical necessity of each record by the recording professional, the records lack foundation and relevance; multiple documents improperly combined as a single document; improper attempt to circumvent requirements for expert testimony and evidence; prejudice outweighs probative value. [handwritten: Objection sustained] |
| P/6 | Findings of Disability by Social Security Administration<br>a. Findings of Disability<br>b. Letter to Felicia Tennessee Awarding Benefits for Disability | Relevance; prejudice outweighs probative value; absence of foundation; multiple documents improperly combined as a single document; improper attempt to circumvent requirements for expert testimony and evidence; improper foundation (inability ever to know the basis for the finding, who made the finding, and what was considered). Defendant also objects that the finding should be excluded on the basis of fraud by the Plaintiff on the Social Security Administration. [handwritten: Objection sustained to documents, except b. (award letter) deferred to trial judge] |
| P/7 | Summary of Prescription Costs for Felicia Tennessee | In the absence of proper expert and opinion testimony as to the medical necessity of each prescription by the prescribing professional, [handwritten: Deferred to trial judge — there is a pending motion to exclude experts.] |

| Trial Ex. No. | Description | Defendant's Objections |
|---|---|---|
| | | the receipts lack foundation and relevance; prejudice outweighs probative value. |
| | Plaintiff reserved the right to use any and all pleadings filed or served by any party and any documents identified by Defendants in its disclosure list | Defendant objects to Plaintiff's assertion that pleadings may be used as exhibits: (1) Pleadings are generally not admissible as evidence unless sworn, which none of these pleadings are; (2) Pleadings contain extraneous material, not relevant to issues which may be before the Court; (3) Pleadings contain hearsay or unsupported allegations; and (4) The admission of pleadings as evidence is unduly prejudicial given their lack of independent probative value.<br><br>Defendant further objects to Plaintiff's assertion that "any documents identified" by Defendant in its "disclosure list" may be used as evidence. Such a reservation of rights violates the local rules, federal rules, and scheduling order, which requires the specific identification of proposed exhibits in a timely manner, to permit the Court to assess the documents and to allow the opposing party to interpose proper objections. Also, certain documents that would be admissible if offered by Defendant would not be admissible if offered by Plaintiff. For example, a statement made out of court by the Plaintiff would be admissible as non-hearsay under Fed. R. Evid. 801 if offered by the Defendant, but would be inadmissible hearsay if offered by Plaintiff. |
| | Plaintiff reserved the right to use any other material for impeachment or rebuttal purposes. | No objection. |

**B. Depending upon the evidence offered by Plaintiff, the following may be offered by Defendant at the trial of this case:**

| Trial Ex. No. | Description | Plaintiff's Objections | |
|---|---|---|---|
| D/1 | Dr. Jerome S. Blackman Expert Report, 7/24/11 | Hearsay; relevance; prejudice outweighs probative value; memorialization of testimony | objection sustained |
| D/2 | Investigation Notes (Bates No. Murphy Brown-Tennessee 000119 - 129), 1/08 – 2/08 | Hearsay; relevance; prejudice outweighs probative value; authenticity; lack of specificity; multiple documents combined as a single document | objection withdrawn by plaintiff; D/2 to D/6 - objection withdrawn |
| D/3 | Murphy-Brown Employee Handbook (Bates No. Murphy Brown-Tennessee 000686 – 740) | Relevance; prejudice outweighs probative value | |
| D/4 | Murphy-Brown Harassment Policy (Bates No. Murphy Brown-Tennessee 000741 – 742) | Relevance; prejudice outweighs probative value | |
| D/5 | Murphy-Brown Employee Handbook and Harassment Policy, Spanish Version (Bates No. Murphy Brown-Tennessee 000748 – 780) | Relevance; prejudice outweighs probative value | |
| D/6 | Plaintiff's Acknowledgements of Receipt of Employee Handbooks and Harassment Policy (Bates No. Murphy Brown-Tennessee 00037 – 39, 61) | Relevance | |
| D/7 | Plaintiff's EEOC determination letter | Relevance; prejudice outweighs probative value; hearsay; authenticity | Defer to Judge Davis.. |
| D/8 | Photographs of the shower room door (Bates No. Murphy Brown-Tennessee 000130 – 152) | No objection | |
| D/9 | The shower room door | No objection | |
| D/10 | Plaintiff's handwritten notes – 12/27/07 | No objection | |
| D/11 | Plaintiff's handwritten notes – 1/31/08 | No objection | |
| D/12 | Transcripts from Plaintiff's Worker's Compensation case | Relevance; prejudice outweighs probative value; not produced in discovery; hearsay<br><br><u>Defendant's response</u>: Defendant withdraws this as a proposed exhibit in its case-in-chief; however, it reserves the right to use this exhibit for rebuttal or impeachment. | Exhibit withdrawn |

| D/13 | Plaintiff's statement provided for her Worker's Compensation case | Relevance; prejudice outweighs probative value; not produced in discovery<br><br>Defendant's response: Defendant withdraws this as a proposed exhibit in its case-in-chief; however, it reserves the right to use this exhibit for rebuttal or impeachment. | Exhibit withdrawn |
|---|---|---|---|
| D/14 | Leigh Flournoy's handwritten notes regarding "heartburn among people on the farm," 1/3/08 | Relevance; prejudice outweighs probative value; hearsay | Objection withdrawn |
| D/15 | Certificate for Return to School or Work, 3/22/08 | Authenticity; lack of foundation; hearsay | Objection sustained |
| D/16 | Progress Note of Mr. Rotfus, 12/18/08 | Single document being offered when entire patient file should come in | Objection sustained D/16 – D/20 |
| D/17 | Mr. Rotfus' Initial Evaluation of Plaintiff, 2/12/08 | Single document being offered when entire patient file should come in | |
| D/18 | Progress Note of Mr. Rotfus, 2/12/08 | Single document being offered when entire patient file should come in | |
| D/19 | MD Progress Note, 6/7/08 | Single document being offered when entire patient file should come in | |
| D/20 | MD Progress Note, 9/27/08 | Single document being offered when entire patient file should come in | |
| D/21 | Dr. Coleman medical records (Bates No. Murphy Brown-Tennessee 000276 – 277), 11/08/08 | Relevance; lack of foundation | Objection sustained |
| D/22 | Plaintiff's Disclosure of Expert Testimony of Gary Rotfus, 7/15/11 | Hearsay; relevance; memorialization of testimony | Objection sustained |
| D/23 | Plaintiff's Disclosure of Expert Testimony of Angelina Espinosa-Guanzon, M.D., 7/23/11 | Hearsay; relevance; memorialization of testimony | Objection sustained |
| D/24 | Plaintiff's medical records produced by Plaintiff or subpoenaed from health care providers | Relevance; prejudice outweighs probative value; lack of specificity; memorialization of testimony; lack of foundation | Objection sustained |
| D/25 | Disability Report (Bates No. Murphy Brown – Tennessee 000155 – 000166) | Relevance Deferred to trial judge | ~~Objection sustained~~ |

| | | |
|---|---|---|
| | Defendant reserved the right to use any and all pleadings filed or served by any party and any documents identified by Plaintiff in her disclosure list. | Plaintiff objects to Defendant's assertion that pleadings may be used as exhibits: (1) Pleadings are generally not admissible as evidence unless sworn, which none of these pleadings are; (2) Pleadings contain extraneous material, not relevant to issues which may be before the Court; (3) Pleadings contain hearsay or unsupported allegations; and (4) The admission of pleadings as evidence is unduly prejudicial given their lack of independent probative value.<br><br>Plaintiff also objects to Defendant's assertion that any documents identified by Plaintiff in her disclosure list may be used. Such a reservation of rights violates the local rules, federal rules, and scheduling order, which requires the specific identification of proposed exhibits in a timely manner, to permit the Court to assess the documents and to allow the opposing party to interpose objections. |
| | Defendant reserved the right to use any other material for impeachment or rebuttal purposes. | No objection. |
| | Defendant reserved the right to use any medical records of any of Plaintiff's treating or expert witnesses. | No objection. |

No specific document Deferred to trial judge

## III. WITNESSES

### A. The names and addresses of all witnesses who will or may testify at the instance of Plaintiff:

| **Witness** | **Objections** |
|---|---|
| 1. Gary H. Rotfus, LCSW, 5265 Providence Road, Suite 500, Virginia Beach, VA 23464. | For the reasons set forth in Defendant's motion to strike, this witness cannot be permitted to testify as an expert or opinion witness. This witness cannot provide medical opinions (not being a physician). The failure of this witness to comply with the appropriate rules in providing any basis for his testimony, and the failure of Plaintiff adequately to respond to interrogatories seeking the substance of this witness' testimony, precludes this witness from offering non-expert opinion or medical testimony as well. In the absence of an admissible |

To be resolved by pending motion – deferred

| **Witness** | **Objections** |
|---|---|
| | opinion-based predicate for this witness's treatment of the Plaintiff, any testimony as to the necessity, substance, cost, or otherwise of Plaintiff's treatment lacks foundation and is inadmissible. |
| 2. Angelina Espinosa-Guanzon, M.D., 5265 Providence Road, Suite 500, Virginia Beach, VA 23464. | For the reasons set forth in Defendant's motion to strike, this witness cannot be permitted to testify as an expert or opinion witness. The failure of this witness to comply with the appropriate rules in providing any basis for her testimony, and the failure of Plaintiff adequately to respond to interrogatories seeking the substance of this witness's testimony, precludes this witness from offering non-expert opinion or medical testimony as well. In the absence of an admissible opinion-based predicate for this witness's treatment of the Plaintiff, any testimony as to the necessity, substance, cost, or otherwise of Plaintiff's treatment lacks foundation and is inadmissible. To be resolved by pending motion — deferred |
| 3. Parthiv J. Sheth, M.D., 9228 George Washington Memorial Hwy., Gloucester, VA 23061 | The proposed substance of this witness's testimony was not properly identified in response to interrogatories seeking the witness identity and those facts known to the witness. No timely identification of this individual as an expert or opinion witness was made, as explained in Defendant's motion to strike Plaintiff's rebuttal expert disclosures, and no expert or opinion report was provided. The failure of this witness to comply with the appropriate rules in providing any basis for his testimony, and the failure of Plaintiff adequately to respond to interrogatories seeking the substance of this witness's testimony, precludes this witness from offering non-expert opinion or medical testimony as well. In the absence of an admissible opinion-based predicate for this witness's treatment of the Plaintiff, any testimony as to the necessity, substance, cost, or otherwise of Plaintiff's treatment lacks foundation and is inadmissible. To be resolved by pending motion — deferred |
| 4. Joyce Nichols, 12394 Saint Lukes Rd., Sedley, VA 23878. | No objection. |
| 5. Catina Garrett, 404 Lesley Ct., Waverly, VA 23890. | No objection. |
| 6. Felicia Tennessee, 13025 Old Bedfield Rd., Capron, VA 23829. | No objection. |
| 7. Bridgett Edwards, 135 Center St., Emporia, VA 23847. | No objection. |

| Witness | Objections |
|---|---|
| 8. Karen Winfield, Address Unknown – to be provided later | No objection. |
| 9. George Eley, 422 Walnut St., Franklin, VA 23851. | The substance of this witness's testimony was not provided in response to proper interrogatories. |
| 10. Samantha V. Jones, 20796 General Thomas Hwy, Newsoms, VA 23874. | The substance of this witness's testimony was not provided in response to proper interrogatories. |
| 11. Reginald Eley, 21331 Barrow Rd., Capron, VA 23829. | The substance of this witness's testimony was not provided in response to proper interrogatories. |
| 12. Theresa Runner Murphy, 29281 Apache Cir., Franklin, VA 23851. | The substance of this witness's testimony was not provided in response to proper interrogatories. |
| 13. Willie Giles, 312 Forest Pine St., Apt. B, Franklin, VA | The substance of this witness's testimony was not provided in response to proper interrogatories. |
| 14. Lewis Epps, 434 East Main Street, Waverly, Virginia 23890 | No objection. |
| 15. Leigh Flournoy, 434 East Main Street, Waverly, Virginia 23890 | No objection. |

Objection overruled Nos 9–13

**B. The names and addresses of all witnesses who will or may testify at the instance of Defendant:**

| Witness | Objections |
|---|---|
| 1. Leigh Flournoy, 434 East Main Street, Waverly, Virginia 23890 | No objection. |
| 2. Laura Brooks, 434 East Main Street, Waverly, Virginia 23890 | No objection. |
| 3. Mary Beth Williams, 434 East Main Street, Waverly, Virginia 23890 | No objection. |
| 4. Lewis Epps, 434 East Main Street, Waverly, Virginia 23890 | No objection. |
| 5. Dr. Jerome S. Blackman, | No objection. |

| Witness | Objections |
|---|---|
| Harbour at Lynnhaven Station Building, Suite 204, 101 North Lynnhaven Road, Virginia Beach, VA 23452 | |
| 6. Bridgett Edwards, 135 Center Street, Emporia, Virginia 23847 | No objection. |
| 7. Gary Rotfus, 5265 Providence Road, Suite 500, Virginia Beach, VA 23464 | No objection. |
| 8. Dr. Angelina Espinosa-Guanzon, 5265 Providence Road, Suite 500, Virginia Beach, VA 23464 | No objection. |
| 9. Ken Bunn, 434 East Main Street, Waverly, Virginia 23890 | No objection. |
| 10. Emily Bunn, 434 East Main Street, Waverly, Virginia 23890 | No objection. |
| 11. Joyce Nichols, 12394 Saint Lukes Road, Sedley, Virginia 23878 | No objection. |
| 12. Catina Garrett, 404 Leslie Court, Waverly, Virginia 23890 | No objection. |

## IV. FACTUAL CONTENTIONS OF EACH PARTY

### A. Plaintiffs' Factual Contentions

1. Tennessee is an African-American female. Tennessee began working for Murphy-Brown in 1997 and continued to work for the Defendant until 2008. Her last day at work was January 31, 2008.

2. Tennessee received largely positive performance evaluations. She was promoted on multiple occasions and was head of the farrowing department on January 31, 2008, her last day at work.

3. During her time as Murphy-Brown, the workforce at its Waverly farms became increasingly populated by non-English speaking Hispanic workers, many of whom were illegal aliens and were illegally employed by Murphy-Brown.

4. On January 31, 2008, there were five individuals who worked with Tennessee on Farm 8. One was Bridgett Edwards, another African-American female. The other four were non-English speaking male Mexican workers, who were illegal aliens and were illegally employed by Murphy-Brown.

5. On January 24, 2008, Tennessee and Edwards were in the Farm 8 female shower room after finishing their day at work. Tennessee decided to wash her hands instead of showering because of the cold temperature outside. She walked to the shower room door, which led to the area where the sinks were located. When she opened the shower room door, one of her male Mexican co-workers, Salvador Rodriguez Hernandez, was kneeling and staring at the door. He attempted to get up as soon as the door opened, almost fell over, and darted away from the door and into the men's shower room.

6. Tennessee and Edwards inspected the door where Hernandez had been kneeling and discovered several holes that would allow a person to see into the women's shower room.

7. Tennessee and Edwards both contacted their farm manager, Leigh Flournoy to report the holes in the shower room door.

8. Instead of replacing the door, Flournoy placed a towel over the door and caulked the holes. When production manager Lewis Epps was asked if the door was going to be replaced, he said it was never going to be replaced.

9. Laura Williams in Murphy-Brown's HR department investigated the incident to determine if the Mexican workers had put the holes in the door and/or had spied on Tennessee and Edwards while in the shower room. She talked to three of the Mexican workers including

Salvador Rodriguez Hernandez. They denied making the holes of spying on Tennessee or Edwards.

10. No disciplinary action was taken against any of the Mexicans who worked with Tennessee or Edwards. At the time, Murphy-Brown was highly reliant upon the work of illegal aliens like the Mexicans at Farm 8. Murphy-Brown knew it was illegally employing Salvador Hernandez who had previously worked for Murphy-Brown under another name- Leonardo Talon. Talon had left Murphy-Brown after being involved in a high speed chase with police, and Murphy-Brown rehired him when he applied for a job as Salvador Rodriguez Hernandez.

11. On January 31st, Tennessee and Edwards met with Brooks and Epps, the production manager, to discuss the handling of the peephole incident. They indicated that they were unhappy with Murphy-Brown's response to the situation and wanted the company to do more to investigate the situation and protect them from the Mexican workers.

12. Tennessee mentioned that on previous occasions one of the Mexican workers had touched her shoulders without her permission. Tennessee also informed them another worker had asked Tennessee to kiss and hug him and called her sexy.

13. Epps and Brooks had dismissive attitudes throughout the meeting. Epps accused Tennessee and Edwards of putting the holes in the door. When they described how that had found Hernandez kneeling over next to the door Epps said maybe he had dropped a pen and then laughed. Edwards asked him how he could accuse her, a married woman, of putting holes in the shower room door so that she could be spied on and how he would feel if someone had drilled holes in a door to look at his female family members. Epps laughed again. Epps told Tennessee and Edwards to get their things from Farm 8 because they would no longer be working there. Tennessee and Edwards did not ask to be transferred to other farms.

14. Epps took no further steps to investigate the situation or punish the Mexican

workers. Instead, he decided to transfer Tennessee and Edwards to different farms.

15. To Tennessee, Murphy-Brown's handling of the situation was the culmination of Murphy-Brown's policy of favoring non-native Hispanic men over African-American women, to the point of permitting sexual harassment to go unchecked and creating a hostile work environment. Whenever an incident involving an African-American female and a Hispanic male occurred, Murphy-Brown swept it under the rug by altering the workplace of one of the parties, usually the victim. Murphy-Brown never punished anyone regardless of the severity of the conduct, and they never informed the victims of what steps they were taking to remedy the situation or followed up to see if those steps were successful. To Tennessee, it appeared as if Murphy-Brown was doing the same thing to her regarding the peephole incident.

16. Tennessee was aware that a woman on another farm, Joyce Nichols, had been pinned to a wall and groped by a Mexican male she worked with on weekend shifts. Nichols had complained, but instead of punishing the Mexican for sexually assaulting Nichols, the farm manager, Ken Bunn, took Nichols off the weekend shift. However, he left her working with the brother of the man who had assaulted her. She had to see her assaulter when he dropped off his brother in the mornings, and his brother began harassing her.

17. Tennessee was also aware that a woman, Karen Winfield had had her panties masturbated in by a Mexican male. He was never punished, just transferred to another farm.

18. In addition, Tennessee knew that Joyce Nichols panties had been tampered with as well. Nichols reported to Ken Bunn that someone had put something wet in the seat of her panties on multiple occasions. Instead of performing an investigation to find out who did it, Bunn placed a lock on the women's shower room door. Bunn did not follow up and Nichols' panties were tampered with again.

19. After the peephole incident, one of the farm managers, Emily Bunn, the wife of

Ken Bunn, called a meeting of employees and told them not to discuss any of the incidents of harassment that had occurred on the farms with anyone.

20. Tennessee began having pain in her chest that Friday, when she returned home from the meeting with Epps and Brooks. The pain intensified to the point that she went to the hospital on Sunday because she thought she was having a heart attack. The doctor at the emergency room diagnosed her with a panic attack.

21. Tennessee was referred to Fairfield Psychological Associates in Virginia Beach. She was diagnosed with Post Traumatic Stress Syndrome and anxiety disorder, caused by what had happened to her at work. Since 2008, Tennessee has suffered from a number of symptoms flowing from her PTSD: panic attacks, chest pains, agoraphobia, flashbacks to being spied on, inability to leave her home and be in public places, fear of Mexican males, and inability to remember instructions and short-term memory loss.

22. Tennessee has been unable to work full-time since leaving Murphy-Brown. She has had some part-time work taking care of an elderly woman who lives a few miles away from her home. This is all Tennessee is currently capable of doing.

23. The Social Security Administration found that Tennessee is disabled, confirming that she is suffering from PTSD and that she became disabled on January 31, 2008, her last day of work at Murphy-Brown.

24. Tennessee and Edwards reported the peephole incident to the police. Salvador Rodriguez Hernandez was arrested. He pled guilty of peeping.

25. Murphy-Brown fired Hernandez after finding out that he plead guilty and admitted to spying on Edwards and Tennessee, but took no further steps to investigate and see if the other Mexican males had also participated in such crimes.

**B. Defendant's Factual Contentions:**

1. Murphy-Brown is a company engaged in the business of producing hogs for sale to Smithfield Packing, for human consumption. Murphy-Brown owns and operates over 450 hog farms in the United States, and has over 6,000 employees located in twelve states. Murphy-Brown is the first livestock operation in the world to obtain the coveted ISO 14001 certification of its Environmental Management System. Murphy-Brown owns and operates a number of hog farms in southeastern Virginia, including the farms on which Ms. Tennessee worked during her tenure with the company.

2. Ms. Tennessee started working for Murphy-Brown in August of 1997. Her first assignment was to Farm 18, working in the farrowing house. Throughout the course of her employment, Ms. Tennessee was transferred to a number of different farms. After working at Farm 18 for a time, Ms. Tennessee was transferred to Farm 39A, then to Farm 19, then to Farm 20, then back to Farm 19, and then finally to Farm 8, which is the farm at which the alleged acts of harassment occurred. Ms. Tennessee's transfer from Farm 18 to Farm 39A was initiated by Ms. Tennessee. She asked to be transferred off of Farm 18 due to perceived favoritism by a manager. The company complied with her request and transferred her. While the remaining transfers, from Farm 39A to Farm 19 to Farm 20 to Farm 19 to Farm 8, were initiated by Murphy-Brown, Ms. Tennessee never objected to any of these transfers or new farm assignments.

3. In January of 2008, Ms. Tennessee worked at Farm 8 with Ms. Edwards. Her farm manager and immediate superior was a woman, Leigh Flournoy. The other workers at Farm 8 at the time were Hispanic male employees: Mr. Miguel Vasquez, Mr. Jose Rodriguez, Mr. Wizberto Izarri and Mr. Salvador Hernandez.

4. In January of 2008, Ms. Tennessee's male co-workers complained to farm manager Flournoy that they were doing a disproportionate amount of the work on the farm. In particular, the male co-workers were concerned that Ms. Tennessee and Ms. Edwards were not cleaning their work areas, a fairly substantial chore. The situation did not improve, and the four male co-workers asked a Spanish-speaking human resource manager to facilitate a meeting with farm manager Flournoy to address their concerns. The male employees indicated that they did not feel they were being treated fairly by Ms. Tennessee and Ms. Edwards. In addition, they said they felt they were performing too many of the job responsibilities that should have been completed by Ms. Tennessee and Ms. Edwards. <u>This meeting took place on January 23, 2008, the day before Ms. Tennessee and Ms. Edwards "suddenly found" that "someone" had made holes in the women's locker room door.</u>

5. After this meeting where the male employees on Farm 8 aired their grievances against Ms. Edwards and Ms. Tennessee, farm manager Ms. Flournoy, spoke with Ms. Tennessee and Ms. Edwards to acquaint them with their co-workers' concerns. Ms. Flournoy specifically requested that Ms. Tennessee and Ms. Edwards show respect for their co-workers.

6. As required by federal law, Murphy-Brown requires any person who enters a hog farm to take a shower and change into company-provided working clothes before entering the working side – or "clean side" – of a farm. Each farm has a headquarters or office building, which contains a laundry facility, men's and women's shower and locker rooms, a lounge or lunch area, and a small office area. Each shower/locker room can be entered from outside the building; after showering, the individual changes into company-provided clothing and may exit into the "clean side" of the building, and enter the farm. At the end of each day, most people

take another shower as they leave the farm, although "showering out" generally is not required by law.

7. According to Ms. Tennessee, she and Ms. Edwards found three small holes in the door between the women's shower room and the short hallway inside the farm office building. That short hallway leads to the outside of the farm, to the men's locker room (in which the laundry facility for Farm 8 is located), to two small restrooms, and to the break room area of Farm 8. Ms. Tennessee says she found the holes on the evening of Thursday, January 24, 2008.

8. At the time Ms. Tennessee says she first saw the holes, all of the other employees of Farm 8 except Ms. Tennessee, Ms. Edwards and Mr. Salvador Hernandez had already left for the day. Ms. Tennessee testified that she entered the women's shower/locker area, and then decided not to "shower out." Rather, she says she decided to exit that room and just wash her hands in the break room area outside the shower area door. When she opened the door (fully clothed), Ms. Tennessee says, Mr. Hernandez was outside the door; she says he "fell" into the door and was "stumbling to keep himself up."

9. Ms. Tennessee testified that she immediately closed the door and thought, "Hmm, for him not to understand English he sure [sic] at the door trying to hear something." Ms. Tennessee says she opened the door again and saw Mr. Hernandez enter the men's bathroom. She went to the break room area, washed her hands and returned to the women's shower room. Ms. Edwards was also in the shower room at the time. Ms. Tennessee alleges that she turned off the lights and saw three holes in the door.

10. Based on the way Mr. Hernandez was standing when the door opened, Ms. Tennessee says she believes Mr. Hernandez was looking through the holes in the door; however, Ms. Tennessee never actually saw Mr. Hernandez – or anyone else -- look through the

holes. Ms. Tennessee actually testified that Mr. Hernandez was standing beside the door, by the wall – not in front of the door – when she first opened the door.

11. Ms. Tennessee drove herself home that night, which usually takes 35 to 40 minutes. When she arrived home, she telephoned her supervisor, Ms. Flournoy; this call was apparently made sometime around or after 6:30 p.m. on January 24, 2008. Ms. Tennessee explained to Ms. Flournoy that she and Ms. Edwards had discovered holes in the door. Ms. Tennessee did not ask Ms. Flournoy to take any action whatsoever. However, Ms. Flournoy told Ms. Tennessee that she would call her direct supervisor, Mr. Lewis Epps, and report the finding. Ms. Flournoy also received a separate telephone call from Ms. Edwards that evening.

12. Ms. Flournoy immediately called Mr. Epps and explained the situation. Mr. Epps directed Ms. Flournoy to go to the farm in the morning, inspect the door, and report back to him. Ms. Flournoy arrived at the farm the next morning, Friday, January 25, 2008, between 6:30 a.m. and 7:00 a.m. to investigate the situation. Ms. Flournoy observed three holes in the door. Ms. Flournoy immediately took photographs of the door to send to Mr. Epps via her cell phone. Ms. Flournoy also covered the holes completely by tacking up sheets of paper over the affected areas of the door. Once the holes were covered with paper, Ms. Tennessee "showered in" in the women's shower area as usual, as did Ms. Edwards and Ms. Flournoy.

13. Throughout that same morning, January 25, 2008, Ms. Flournoy maintained contact with her supervisor, Mr. Epps, and provided updates regarding the door situation. Ms. Flournoy had a prior commitment at another farm that morning, but returned to Farm 8 later in the day and filled each of the holes with caulk, to provide a more permanent repair.

14. Mr. Epps also drove to Farm 8 that same day, Friday, January 25, to examine the door. Ms. Flournoy met with Mr. Epps and showed him the door and the caulked holes. While

Ms. Tennessee saw Mr. Epps meeting with Ms. Flournoy, Ms. Tennessee did not say anything to Mr. Epps.

15. At her deposition, Ms. Tennessee testified that Ms. Flournoy properly "did her job" in handling the door incident.

16. January 25 was a Friday; Ms. Tennessee was scheduled to work that weekend and told Ms. Flournoy that she was uncomfortable doing so if she were to be the only female employee on Farm 8. Although Ms. Flournoy was not previously scheduled to work that weekend, Ms. Flournoy agreed to come in to ease Ms. Tennessee's concern. Ms. Tennessee testified that Ms. Flournoy's agreement to work over the weekend with Ms. Tennessee was an acceptable resolution of the concerns she expressed. Following her weekend shift, Ms. Tennessee was not scheduled to work until Tuesday, January 29.

17. On Monday, January 28, Ms. Laura Brooks, an Employment Manager in the Human Resource Department, received a call from Mr. Epps. Mr. Epps explained the situation with the door and the steps already taken to resolve the problem; however, he wanted to make sure that the Human Resource Department was aware of the situation. Ms. Flournoy spoke with Mr. Epps again on Monday, January 28. Mr. Epps directed Ms. Flournoy to place a towel over the caulked door to provide further protection. Ms. Flournoy did so.

18. Ms. Tennessee returned to work on Tuesday, January 29. She "showered in" and "showered out," as usual. Ms. Tennessee did not complain to, or even speak to, Mr. Epps or any Human Resource representative about the door incident on Tuesday. Ms. Tennessee testified that she was able to perform her job duties without any problems on Tuesday, January 29. Ms. Tennessee also worked on Wednesday, January 30, 2008. She showered in and showered out, again as usual. Ms. Tennessee testified that she was able to perform her job duties without any problems on Wednesday, January 30.

19. Ms. Brooks spoke further about the incident with Mr. Epps on Wednesday, January 30. Ms. Brooks planned to interview Mr. Hernandez to obtain additional information.

20. On Thursday, January 31, Ms. Tennessee reported to Farm 8, but told Ms. Flournoy that she and Ms. Edwards were not going to work. Rather, Ms. Tennessee says, she and Ms. Edwards were going to the main office to speak with the Human Resource Department. Ms. Flournoy raised no objection to their proposal. Ms. Tennessee and Ms. Edwards arrived at the main office for Murphy-Brown operations in that section of Virginia, which is located some fifteen minutes away from Farm 8. Ms. Edwards and Ms. Tennessee asked to speak with Mary Beth Williams, the senior human resources employee at the site; Ms. Williams was out of town and sick, so Ms. Edwards and Ms. Tennessee met with Laura Brooks and Lewis Epps in a conference room for approximately an hour and a half.

21. During this meeting, Ms. Brooks asked Ms. Tennessee what she wanted done about the situation; Ms. Tennessee stated that she did not have any particular action to suggest. According to Ms. Brooks and Mr. Epps, both Ms. Tennessee and Ms. Edwards stated that they did not want to return to Farm 8. Ms. Brooks and Mr. Epps testified that Ms. Tennessee stated that she was fine with a transfer to another farm; however, she specifically requested not to be transferred to Farm 19 because she did not get along with Ms. Ruby Spillman, a worker on Farm 19. Ms. Tennessee denies that she told Ms. Brooks and Mr. Epps that she did not want to return to Farm 8, and denies that she mentioned any preference to avoid Ms. Spillman.

22. The parties agree that, at this meeting, Ms. Brooks would contact Ms. Tennessee later that same day, Thursday, January 31, to tell Ms. Tennessee to which farm she would be transferred. Ms. Brooks left a telephone message for Ms. Tennessee on Thursday evening, stating that Ms. Brooks would inform Ms. Tennessee by Friday, the next day, which farm to report to for work.

23. Following the meeting on Thursday, January 31, Human Resources interviewed three of the men who worked on the farm with Ms. Tennessee and Ms. Edwards: Mr. Miguel Vasquez, Mr. Salvador Hernandez, and Mr. Jose Rodriguez. Each of these co-workers denied making the holes, denied looking through the holes, and generally denied knowledge of the incident. However, during the interviews, the men reiterated their earlier complaints about working with Ms. Tennessee and Ms. Edwards. For example, Mr. Vasquez complained that Ms. Tennessee yelled at him, failed to give him clear instructions, and threw a pig at him. The men reiterated their complaints of lack of teamwork and problems with obtaining necessary supplies. Mr. Vasquez explicitly suggested that Ms. Tennessee and Ms. Edwards might have created the pinholes themselves in an attempt to "set up" Mr. Hernandez and get him in trouble.

24. Mr. Hernandez admitted that he was walking by the women's shower room when Ms. Tennessee opened the door, but he denied that he was peeking in.

25. Accordingly, the Human Resource Department was unable conclusively to determine who was responsible for making the holes, and whether Mr. Hernandez or anyone ever looked through the holes.

26. Ms. Tennessee stayed home from work on Friday, February 1. Ms. Brooks called Ms. Tennessee that afternoon, but was unable to reach her. Ms. Brooks left a voicemail message for Ms. Tennessee that afternoon, directing her to report for work to Farm 7 the following Monday. Farm 7 is "[r]ight across the field" from Farm 8. Ms. Tennessee did not know who was working at Farm 7 at that time. Although she was aware that two women, Charlene Smith and Jeannette, worked at Farm 7, she was unaware of any male Hispanic employees working there at that time.

27. At her deposition, Ms. Tennessee admitted that she was not aware of anything about Farm 7 that would make working there any "worse" than working at her previous location, Farm 8. Ms. Tennessee stated:

> Q: Was there anything about working at Farm 7 that was worse than working at Farm 8?
>
> A: I can't say. I never worked at Farm 7.

28. Ms. Tennessee did not report to Farm 7 the following Monday. Ms. Tennessee called in sick. She thereafter stopped coming to work altogether.

29. Unknown to Murphy-Brown, Ms. Tennessee swore out a criminal complaint against Mr. Hernandez for "peeping" in a residence. Shortly thereafter, the police came to Farm 8 and arrested Mr. Hernandez, taking him away in handcuffs. Unrepresented and unable to speak English, Mr. Hernandez pleaded guilty on February 12, 2008 to a charge in connection with the door incident. After learning of the guilty plea, the Human Resource Manager, Ms. Mary Beth Williams, met with Mr. Hernandez in her office. Mr. Hernandez explained to Ms. Williams: "I didn't do it, but the person that went with me to translate in the courtroom told me if I pleaded guilty then this would all be over." Despite Mr. Hernandez's explanation, Ms. Williams immediately terminated Mr. Hernandez.

30. In her deposition, Ms. Tennessee testified that she experienced two other incidents that may have constituted sexual harassment or discrimination while employed by Murphy-Brown. First, Ms. Tennessee claims that in December of 2007, Mr. Jose Rodriguez, a Hispanic co-worker with limited English skills, said "Felicia, you sexy" and "[f]riends hug and kiss." Ms. Tennessee verbally reported the incident to Ms. Flournoy. This conduct stopped; Mr. Rodriguez never said anything similar to Ms. Tennessee after this December 2007 incident. Second, Ms. Tennessee claims that Mr. Rodriguez rubbed her shoulder one day. In response,

Ms. Tennessee told Mr. Rodriguez to keep his hands off of her. No further touching ever occurred.

31. Ms. Tennessee does not fault Murphy-Brown for either of these two minor issues with Mr. Rodriguez. In fact, Ms. Tennessee testified that she only takes issue with how Murphy-Brown investigated the door incident. Prior to that investigation, Ms. Tennessee admitted that Murphy-Brown did not do anything wrong to her.

32. Ms. Tennessee seeks to rely on the opinions of Gary Rotfus, L.C.S.W. and Angelina Espinosa-Guanzon, M.D. to show that because of the shower door incident, Ms. Tennessee now suffers from Post Traumatic Stress Disorder ("PTSD").

33. The expert report submitted by Dr. Espinosa-Guanzon, however, is only two sentences long and states, in its entirety:

> I have reviewed all available records referable to Ms. Felicia Tennessee (Dr. Shiath, the undersigned, Gary Rotfus, L.C.S.W.). I concur with the initial and continuing diagnosis of Post-Traumatic Stress Disorder and Major Depressive episodes consistent to the work place circumstances of early 2008.

34. Ms. Tennessee submitted no additional Rule 26(a)(2)(B) disclosures regarding Dr. Espinosa-Guanzon.

35. Ms. Tennessee submitted a two-page report from Mr. Rotfus with no additional Rule 26(a)(2)(B) disclosures.[1] It is unclear from the language of Mr. Rotfus' report which opinions are those of Mr. Rotfus and which are simply tangential commentary provided by another scrivener of the report. For example, the report includes statements such as: "Mr. Rotfus indicated that Dr. Guanzon could provide further information. . ." and "According to Mr. Rotfus, he explained the criteria for a diagnoses of PTSD, and how this applied to Ms. Tennessee. . . ,"

---

1 Both of Plaintiff's expert disclosures were untimely. Plaintiff's disclosures were due on July 13, 2011. Defendant's counsel received Mr. Rotfus' report on July 16, 2011 and received Dr. Espinosa-Guanzon's report on August 1, 2011.

leading one to assume that the report was not even prepared by Mr. Rotfus. In addition, the report includes subsequent commentary that appears more like inadmissibly inflammatory legal advocacy than medical analysis. (stating that "[a]n analogy of how she was treated is the way rape victims were once treated by the police in the courts.")

36. Further, even Ms. Tennessee questions the reliability of certain underlying records upon which Mr. Rotfus' report is presumably based. For example, a 12/18/08 Progress Note for Ms. Tennessee, obtained from Mr. Rotfus during discovery, references a house foreclosure and the overwhelming feelings and functioning difficulties triggered by the foreclosure. However, Ms. Tennessee is adamant that her house was never foreclosed and that Mr. Rotfus' notes are inaccurate.

> Q: This is the progress note from December 18th, 2008. It says, "Patient has had a difficult week. Received notice house is being foreclosed. Feeling overwhelmed." Did you ever receive a notice your house was being foreclosed?
>
> A: No, sir.
>
> Q: Got any idea why the doctor's notes in the file says –
>
> A: They're the wrong notes. They're not mine.
>
> Q: It says "Felicia Tennessee" on the bottom.
>
> A: I'm sorry.
>
> Q: Do you think the doctor blew it?
>
> A: I'm sorry, but it's not my notes. They're not my notes.

37. Similarly, Mr. Rotfus' Initial Evaluation of Ms. Tennessee on February 12, 2008, listed "possible seizures" in her medical history; yet, Ms. Tennessee testified that she never told Mr. Rotfus about any seizures. Mr. Rotfus' records also state that Ms. Tennessee "had to work with same individuals;" yet Ms. Tennessee admits the inaccuracy of such a statement.

> Q: At the bottom, the last line, it says, "Had to work with same individuals." Did you tell Mr. Rotfus if you went back to work you'd have to work with the same people?

> A: No. I mean, how would I be working with the same people if I was sent to a different farm unless they was [sic] on the same farm?

38. Additionally, Mr. Rotfus' report contains statements that are inconsistent with the allegations of Plaintiff's Complaint, as well as uncontested facts established during discovery. For example, the report states that "Ms. Tennessee described several Mexican male employees hovering around the locker area." However, Plaintiff's Complaint includes no such allegations. In her Complaint, Plaintiff stated that she encountered one Hispanic farm worker, Mr. Hernandez, as she opened the shower door, fully clothed, after washing her hands.

39. Mr. Rotfus' report describes Plaintiff as "very modest," and claims that her modesty is "consistent with her social background and committed church involvement." However, Plaintiff admitted during her deposition that she shot at her husband because he took some money out of her purse.

40. Mr. Rotfus' report and "diagnosis" (he is not a physician) is largely predicated on the proposition that Ms. Tennessee "was not taken seriously" after reporting the door incident to management. However, this statement conflicts with deposition testimony that Plaintiff's supervisor investigated the incident between 6:30 a.m. and 7:00 a.m. the following morning (after learning of the incident the previous evening); ensured the holes were covered immediately with paper and then with caulk, and finally covered with a towel. A few days later, the whole door was replaced. Additionally, Human Resource representatives interviewed farm workers about the incident, met with Plaintiff to discuss options, and worked with Plaintiff to transfer her to a nearby farm after learning of her continued uneasiness at Farm 8. Further, upon learning that Mr. Hernandez pleaded guilty to a criminal charge related to this incident, Defendant

terminated Mr. Hernandez's employment.[2]

41. Murphy-Brown's expert, Dr. Jerome Blackman, performed a 2-hour mental examination of Ms. Tennessee on July 21, 2011. Dr. Blackman concluded that "Ms. Tennessee shows many of the signs of chronic schizophrenia (Axis I, DSM-IV-TR)." He further explained that "[t]he differential diagnosis for this illness includes, potentially, psychosis NOS with borderline personality disorder." Dr. Blackman does not agree that Ms. Tennessee suffers from PTSD. Dr. Blackman stated:

> Following DSM-IV-TR, a trauma must constitute a life-threatening event or something close to a life-threatening event. Studies such as that on refugees from the Soviet Bulgarian work camps (Tomov and Guentchev, 1993) have documented the reactions of people who have been tortured, people who have witnessed others killed in front of them, and people who have come within a hair's breadth of being killed, themselves. In my opinion, although not pleasant, a few peepholes in a women's washroom, where Ms. Tennessee was not actually observed naked, does not constitute a "trauma," as per the DSM-IV-TR.

42. Dr. Blackman also explained that a PTSD diagnosis requires "repetitive experiences of terror in the person who has had a trauma." Dr. Blackman concluded, however, that "In my opinion, Ms. Tennessee is not a woman for whom relatively sophomoric sexual teasing should have had much impact, even if that teasing occurred." Further, Dr. Blackman noted that a PTSD diagnosis requires "traumatic dreams that are relatively close to the incident itself." Dr. Blackman explained:

> The dreams that Ms. Tennessee reports, on the other hand, are quite different. Although she reports, vaguely, one dream of Mexican men looking at her, most of her list of nightmares concerns a number of other matters. She does not manifest with what Renik (1981) termed "traumatic dreams" nor "post traumatic

2 Mr. Hernandez was terminated despite the fact that he maintained his innocence. Mr. Hernandez explained to Defendant's Human Resource Manager, Ms. Mary Beth Williams, that the person who accompanied Mr. Hernandez to court to translate for him told him that if he pleaded guilty to the charge "then this would all be over." Nevertheless, Defendant terminated Mr. Hernandez because of his guilty plea.

> dreams." This is not surprising since what occurred did not constitute a "trauma."

43. Finally, Dr. Blackman explained that "hypervigilance and easy irritability can be part of the PTSD syndrome." While Dr. Blackman considers Ms. Tennessee to be hypervigilant, in that she has paranoid psychotic symptoms, he states: "These symptoms, however, in my opinion, have nothing to do with the peepholes at work. Rather, she is chronically ill and has had a number of paranoid psychotic symptoms throughout the years. Therefore, any hypervigilance and irritability have been chronic, and not readily attributable to simply discovering peepholes at work." Dr. Blackman also noted that Ms. Tennessee did not become overwhelmed at the time of the shower door incident. She was capable of attending work through January 31, 2008 without any psychological complaints and had a number of discussions with others about the incident in that timeframe.

44. Dr. Blackman concluded:

> In summary, I do not believe Ms. Tennessee is suffering from post traumatic stress disorder. It does appear to me that she has a very serious mental illness, which some might judge to be incapacitating. Unfortunately, the usual progression of untreated schizophrenic illnesses is that they become worse over time. . . . It seems that, without being treated, her symptomatology has progressed over a number of decades, and at least one psychiatrist felt that she was disabled.

45. Ms. Tennessee does not challenge her termination from Murphy-Brown and has never claimed that she was constructively discharged. She voluntarily left her job.

46. Recovery in this case, which is brought entirely under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.*, is limited by 42 U.S.C. § 1981a.

47. Punitive damages are not available based on Murphy-Brown's well-articulated and disseminated policy against sexual harassment in the workplace. *See Kolstad v. American Dental Ass'n*, 527 U.S. 526 (1999).

## V. TRIABLE ISSUES

### A. Plaintiff

1. Did Defendant violate Title VII of the Civil Rights Act of 1964?

2. Has Plaintiff suffered compensable damages due to Defendant violating Title VII?

3. Would a reasonable person in Plaintiff's position, with full knowledge of the facts and circumstances, be deterred from asserting her rights under Title VII due to Defendant's actions?

4. Is Plaintiff entitled to punitive damages under the facts proven?

### B. Defendant:

1. Has Plaintiff proved by a preponderance of the evidence that she experienced harassment at Murphy-Brown because of her gender?

2. Has Plaintiff proved by a preponderance of the evidence that she experienced harassment at Murphy-Brown that was so severe and pervasive that it altered the conditions of her employment and created an abusive work environment, both objectively and subjectively?

3. Has Defendant proved by a preponderance of the evidence that it acted promptly and effectively to remedy each instance of reported harassment?

4. Has Plaintiff proved by a preponderance of the evidence that she engaged in a protected activity?

5. Has Plaintiff proved by a preponderance of the evidence that she suffered an adverse employment action as a result of her engaging in a protected activity?

Defendant reserves the right to amend its list of triable issues to conform to the Court's ruling, if any, in the pending motion for summary judgment.

ENTERED this 23rd day of September, 2011.

United States ~~District Court~~ Judge
magistrate

WE ASK FOR THIS:

Henry L. Marsh, III, Esq.
Hill, Tucker & Marsh
422 East Franklin Street, Suite 301
Richmond, Virginia 23219
804-648-9074
htm@htm-law.com
*Attorneys for Plaintiff*

Henry E. Howell, III, Esq.
The Eminent Domain Litigation Group, P.L.C.
One East Plume Street
Norfolk, Virginia 23510
757-446-9999
heh@eminentdomaingroup.us
*Attorneys for Plaintiff*

SEEN AND AGREED:

John M. Bredehoft (VSB No. 33602)
Mark E. Warmbier (VSB No. 77993)
KAUFMAN & CANOLES, P.C.
150 West Main Street, Suite 2100
Norfolk, VA 23510
Telephone: (757) 624-3000
Facsimile: (757) 624-3169
jmbredehoft@kaufcan.com
mewarmbier@kaufcan.com
*Attorneys for Defendant*

Frank A. Edgar Jr. (VSB No. 36833)
KAUFMAN & CANOLES, P.C.
11815 Fountain Way, Suite 400
Newport News, VA 23606
Telephone: (757) 873-6300
Facsimile: (757) 873-6359
faedgarjr@kaufcan.com
*Attorneys for Defendant*
11302061_4.DOC