IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | |
|---|---|
| FELICIA D. TENNESSEE ) | |
| ) | |
| ) | |
| PLAINTIFF, ) | |
| ) | |
| v. ) | Case No. 2:10cv167 |
| ) | |
| ) | |
| MURPHY- BROWN, L.L.C., ) | |
| ) | |
| DEFENDANT. ) | |

### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This memorandum is submitted to the court in opposition to Defendant Murphy-Brown, L.L.C.'s Motion for Summary Judgment.

### Material Facts as to which a Dispute Exists

For these purposes, the Court must assume that the following material facts, which Murphy-Brown did not list as "undisputed", are disputed by Murphy-Brown. And as all inferences on summary judgment must be made for the Plaintiff, all inferences made by Murphy-Brown that are contrary to the facts below are in dispute.

1.   Tennessee was a very good worker. She took pride in her work, took good care of the animals in her charge, thought of ways to improve the farms, and received bonuses for exceeding production goals. Epps Deposition, Exhibit 1 (15-16); Flournoy Deposition, Exhibit 2 (23-24).

2.   Murphy-Brown began hiring an increasing number of alien non-English speaking Hispanic workers beginning around 2003. Murphy-Brown needed these workers because it found it difficult to meet its staffing needs from the areas surrounding its south side farms. Epps Deposition (9-10); Brooks Deposition, Exhibit 3 (11-12).

1

3. Salvador Hernandez had previously worked for Murphy-Brown under the name Leonardo Talon. His employment as Leonardo Talon ended after he was involved in a high-speed chase with the police, but Murphy-Brown rehired him under the name Salvador Rodriguez Hernandez. Flournoy Deposition (38-39). Murphy-Brown knew it had hired the same man under different names, but did not conduct an investigation into how that could have happened either before or after the peephole incident occurred. Flournoy Deposition (38-39); Williams Deposition, Exhibit 4 (11-12).

4. In 2005, two female African-American workers on Farm 6 had their panties tampered with. Joyce Nichols and Catina Garrett had their lockers in the women's shower room broken into and their underwear soaked with semen on multiple occasions. Garrett Deposition, Exhibit 5 (22-29). Their underwear had been masturbated in by a Mexican worker named Isidro. Garrett Deposition (29). They reported the incidents to the farm manager, Ken Bunn, who placed a lock on the women's shower room door. Garrett Deposition (23-24). However, the lock did not work, and the incidents continued for a period of time. Nichols Deposition, Exhibit 6 (25). Garrett also spoke with Mary Beth Williams in the HR department about the incident. Williams said that nothing could be done aside from either transferring Nichols and Garrett or transferring Isidro. Garrett did not want to be transferred, so Isidro was supposed to be transferred. However, Murphy-Brown did not transfer Isidro or impose any other disciplinary measure for his actions. Garrett Deposition (26-27).

5. Sometime in 2005 or 2006, Nichols was pinned against a wall for four minutes and groped by a Mexican worker who she worked with during her weekend shifts at Farm 7. Nichols Deposition (13-14, 22). Nichols reported the incident to Ken Bunn. Bunn did not ask what body parts the assailant had touched. He did not tell Nichols what disciplinary measures, if any, were

taken against her assailant. Nichols Deposition (17-18). She was only told that she would no longer work on the same farm as him, and she was taken off the weekend shift at Farm 7. Nichols Deposition (18, 20). However, she still saw him every morning as he dropped off his brother Valentine, who worked with Nichols at Farm 6. Nichols Deposition (20). Also, Valentine began harassing Nichols after she complained about his brother. Nichols Affidavit, Exhibit 7. Murphy-Brown management never followed up to see how Nichols was doing or how her relationship with Valentine was affected by her having reported his brother for assaulting her. Nichols Affidavit.

6. In October 2006, Isidro once again broke into the women's shower room at Farm 6 and masturbated in a pair of women's panties- this time Karen Winfield's. Winfield Deposition, Exhibit 8 (6-7). Once again Mary Beth Williams said all Murphy-Brown could do was transfer Winfield or Isidro. This time Isidro was transferred to another farm. However, no other disciplinary measures were taken. Winfield Deposition (9-10).

7. Tennessee and Bridgett Edwards, Tennessee's co-worker in the Farm 8 farrowing department, discovered a drawing of male and female genitalia scratched onto the lunch table they regularly used. They reported the drawing to Leigh Flournoy, their farm manager, who had the image removed. However, Flournoy did nothing when they reported an identical drawing on a sow processing card that came from the breeding room where the Hispanics worked. Tennessee Affidavit, Exhibit 9; Amended Complaint Paragraph 13.

8. Tennessee reported that the Mexicans gathered together and talked amongst themselves while gesturing and pointing at her. She felt intimidated and informed Flournoy, but Flournoy took no action. Tennessee Affidavit; Amended Complaint 14.

9. In December 2007, Tennessee reported to Flournoy that Jose Rodriguez, one of her Mexican co-workers had approached her, repeatedly told her she was sexy, and said he wanted to hug and kiss her. Tennessee brought this incident up with Flournoy on multiple occasions, but Flournoy never said what, if anything, she had done to investigate Tennessee's complaints or discipline Rodriguez. Tennessee Deposition, Exhibit 10 (43-46). Shortly after that, Rodriguez escalated his behavior and began rubbing Tennessee's shoulders. Tennessee had to tell him to stop. Tennessee Deposition (47).

10. Tennessee and Edwards never asked to be transferred from Farm 8 after the peephole incident. It was Murphy-Brown's idea to transfer them. Tennessee Deposition (84); Edwards Deposition, Exhibit 11 (51-52).

11. During the week between the peephole incident and Tennessee and Edward's last day at work, Edwards inquired on multiple occasions if the door was going to be replaced. Epps, the production manager, said the door was never going to be replaced, but provided no explanation as to why. Edwards Deposition (33, 48, 50).

12. At the January 31 meeting between Tennessee and Edwards and Brooks and Edwards, Epps repeatedly laughed at Edwards and Tennessee as they described the peephole incident and relayed their concerns. Tennessee Deposition (84); Edwards Deposition (61-62). He laughed when they described how Hernandez had been bent over at the level of the holes in the door and said that maybe Hernandez had dropped a pen on the floor and was bending down to pick it up. He also accused Edwards and Tennessee of putting the holes in the door. When Edwards asked how he could accuse her, a married woman, of putting holes in the door so that she could be spied upon and how he would feel if it was one of his female family members he laughed again. Edwards Deposition (61-62).

13. Farm 6, 7, and Farm 8 are all in the same area. Farm 8 and Farm 7, the farm Tennessee was transferred to, are connected by a path. Flournoy Deposition (14-15).

14. After this lawsuit was filed, Emily Bunn threatened to fire anyone who talked about the incidents of harassment that occurred on the farms. And when Garrett and Nichols were having their panties masturbated in, Ken Bunn and Epps told them to keep quiet and not tell anyone about it. Garrett Deposition (33).

## Standard of Review

A motion for summary judgment must be denied unless after "accepting [the non-moving party's] evidence as true and drawing all justifiable inferences in her favor" there is no issue of material fact and the moving party is entitled to judgment as a matter of law. Paroline v. Unisys Corp., 879 F.2d 100, 105 (1989); Fed.R.Civ.P. 56(c). "The question at the summary judgment stage is not whether a jury is *sure* to find a verdict for the plaintiff; the question is whether a reasonable jury could rationally so find." Hoyle v. Freightliner, LLC, ___ F.3d ___ (4th Cir. 2011) (emphasis in original).

## Argument[1]

**I. Tennesee has produced sufficient evidence to support a hostile work environment claim.**

In order to make out a hostile work environment claim based on sex, "a plaintiff must show that the offending conduct (1) was unwelcome, (2) was because of her sex, (3) was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive

---

[1] Plaintiff has chosen to address the issues discussed in Murphy-Brown's brief. However, Plaintiff notes that the brief does not discuss all issues and all claims in this case. For instance, Plaintiff has a claim for general discrimination under Title VII based upon disparate treatment between the African-American females and the Hispanic males. When Plaintiff complained of the peephole it took Murphy-Brown one week to take the issue up with the Hispanics. When the Hispanics complained about her and Edwards, Murphy-Brown addressed the complaints the same day.

5

working environment, and (4) was imputable to her employer." Hoyle, ___ F.3d ___ (quoting Bonds v. Leavitt, 629 F.3d 369, 385 (4th Cir. 2011).

Murphy-Brown challenges the third and fourth prongs of the hostile work environment test: whether the offending conduct was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment, Murphy-Brown Memo at 24-26, and whether this conduct was imputable to Murphy-Brown. Murphy Brown Memo at 19-24.

> **A.** **The evidence, when reviewed in the light most favorable to Tennessee, demonstrates that the offending conduct was sufficiently severe or pervasive to alter the terms and conditions of her employment and create an abusive work environment.**
>
> The question of whether harassment was sufficiently severe or pervasive is "quintessentially a question of fact." Paroline v. Unisys Corp., 879 F.2d 100, 105 (4th Cir.1989), vacated in part on other grounds, 900 F.2d 27 (4th Cir.1990) (en banc). There are "both subjective and objective components" to this element. Ocheltree, 335 F.3d at 333 (citing Harris v. Forklift Systems, Inc., 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). The environment must be perceived by the victim as hostile or abusive, and that perception must be objectively reasonable. Harris, 510 U.S. at 22, 114 S.Ct. 367. "[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.' " Oncale, 523 U.S. at 81, 118 S.Ct. 998 (quoting Harris, 510 U.S. at 23, 114 S.Ct. 367). In addition, the totality of the circumstances includes conduct directed not at the plaintiff. Spriggs v. Diamond Auto Glass, 242 F.3d 179 (4th Cir.2001) (rejecting the contention that only conduct directed at the plaintiff could be considered in evaluating a hostile work environment claim). Rather, the inquiry concerns the nature of the workplace environment, "and whatever the contours of one's environment, they surely may exceed the individual dynamic between the complainant and [the alleged wrongdoer]." Id. at 184. See also EEOC v. Fairbrook Medical Clinic, P.A., 609 F.3d 320, 328 (4th Cir.2010); Jennings v. University of North Carolina, 482 F.3d 686 (4th Cir.2007) (en banc) (noting that in reviewing hostile environment cases "[a]ll the circumstances are examined ... [and] [e]vidence of a general atmosphere of hostility toward those of the plaintiff's gender is considered in the examination of all the circumstances"). See also Harris, 510 U.S. at 23, 114 S.Ct. 367 ("[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances.").

Hoyle, ___ F.3d ___. The totality of circumstances presented by Tennessee is sufficient for a jury to conclude that the harassment in her workplace was severe and pervasive. She has produced evidence of harassment directed at her as well as harassment directed at other females at Murphy-Brown, creating an environment in which female African-Americans are targeted for harassment by their Hispanic coworkers.

In the three years leading up to the peephole incident other women at the Murphy-Brown farms experienced severe harassment. No fewer than three women had their panties masturbated in, some on multiple occasions. Garrett Deposition, (22-29); Winfield Deposition, (6-7). A woman was pinned against a wall for an extended period of time and groped. Nichols Deposition (13-14, 22). When the victim complained, she was left at a farm with the perpetrator's brother and had to endure his harassment. Nichols Affidavit.

Tennessee herself was harassed and discriminated against because of her sex. Sex organs were drawn on the table she routinely ate lunch at and sow processing cards were also covered with drawings of genitalia. Tennessee Affidavit; Amended Complaint Paragraph 13. The men discussed body parts during lunch breaks, making reference to vaginas and butts while smiling and looking at Tennessee and Edwards. Edwards Deposition (39-42). One of her Mexican co-workers repeatedly told her she was sexy, and said he wanted to hug and kiss her. When nothing was done, the harassment escalated and the assailant began making physical contact with Tennessee. Tennessee had to tell him to stop. Tennessee Deposition (47). And, of course, Tennessee was spied on through peepholes in the women's shower room. Arrest Warrant and Guilty Plea of Salvador. Salvador Rodriguez Hernandez Arrest Warrant and Guilty Plea, Exhibit 12.

All of these occurrences taken together paint a picture of a workplace in which female African-Americans are under siege by their Hispanic co-workers. A jury can also infer that the situation was made all the worse by the seeming acquiescence of Murphy-Brown management who favored the Hispanic males because they were dependent on their labor to keep the farms running as there were not enough native workers in south side to meet Murphy-Brown's staffing needs. Epps Deposition (9-10); Brooks Deposition (11-12). Murphy-Brown rehired ex-workers who were involved in high speed chases under new assumed names. Flournoy Deposition (38-39). When Hispanic workers complained that Tennessee and Edwards were not doing their fair share of work on Farm 8, Leigh Flournoy took their complaints seriously and addressed Tennessee and Edwards the same day. Flournoy Note, Exhibit 13. However, after Edwards and Tennessee reported the peephole incident- a much more serious occurence- management took a week to begin its investigation and interview the Mexicans. Furthermore, management only began the investigation after Tennessee and Edwards showed up at Murphy-Brown's main offices in Waverly and complained about management's handling of the issue. Brooks Deposition (20-23).

A jury can reasonably determine that the harassment aimed at Tennessee, the harassment aimed at other women, and Murphy-Brown's preferential treatment of Hispanic males created a hostile work environment and constituted unlawful discrimination. There should be no question here. Plaintiff has proven the allegations in her complaint, which survived a motion to dismiss, and more. See Edwards v. Murphy-Brown, LLC, 760 F.Supp2d 607 (EDVA 2011).

    **B.**    **A jury could rationally conclude that Murphy-Brown did not take remedial action reasonably calculated to end the harassment.**

> Where an employee has been harassed by a coworker, "the employer may be liable in negligence [under the fourth element] if it knew or should have known about the harassment and failed to take effective action to stop it."

8

> Ocheltree v. Scollon Prods., 335 F.3d 325, 333–34 (4th Cir.2003) (en banc); Howard v. Winter, 446 F.3d 559, 565 (4th Cir.2006). "Once the employer has notice, then it must respond with remedial action reasonably calculated to end the harassment." EEOC v. Sunbelt Rentals, Inc., 521 F.3d 306, 319 (4th Cir. 2008).

E.E.O.C. v. Xerxes Corp., 639 F.3d 658 (4th Cir. 2011). Here, a reasonably jury could conclude that Murphy-Brown did not take prompt remedial action reasonably calculated to end the hostile work environment. Murphy-Brown did not make a good faith effort to change the radioactive culture of its farms. Instead it took the easy way out- performing no or minimal investigation before simply reassigning the victims of harassment and then not following up to see how the victims were doing. Furthermore, Murphy-Brown fostered an environment in which complaints were trivialized and discussion of the farms' problems was discouraged with the threat of being fired.

Joyce Nichols and Catina Garrett had their panties masturbated in by Isidro, but Murphy-Brown took no remedial or disciplinary action against him. Ken Bunn placed a lock on the women's shower room door, but the incidences continued and Murphy-Brown never followed up to see how they were doing. Nichols Deposition (25). Bunn said there was nothing else Murphy-Brown could do because it was a he said/she said situation. Bunn Deposition, Exhibit 14 (21). Mary Beth Williams offered to transfer either Nichols and Garrett or Isidro, but when they said they did not want to be transferred she did not transfer Isidro either. Garrett Deposition (26-27). Instead, they let him stay on the farm until he masturbated in yet another woman's panties, and even then they did not discipline him, saying that transferring him to another farm was all they could do. Winfield Deposition (9-10).

A similar story plays out with Joyce Nichols and her assaulter. Nichols claims she was pinned against a wall and groped. The full extent of Murphy-Brown's investigation was to ask

9

the perpetrator if he did it, and, when he denied it, to take the victim off her weekend assignment because it was a he said/she said situation. Bunn Deposition (13-14). Furthermore, Murphy-Brown did not follow up with Nichols or consider the fact that Nichols might suffer from harassment from the brother of the man she reported. Nichols Affidavit.

Flournoy did nothing when Edwards and Tennessee reported the sow processing card with the drawings of genitalia; nothing when Tennessee said she was intimidated by the Mexicans when they gathered and talked amongst themselves while pointing at her; and nothing when Tennessee reported that Jose Rodriguez said she was sexy and wanted to kiss her, even when Tennessee asked her how she was handling the situation. Tennessee Affidavit; Amended Complaint Paragraph 13-14.

Most telling of all, however, is Murphy-Brown's handing of the peephole incident. Murphy-Brown did not take action reasonably calculated to solve the problem. Murphy-Brown did not replace the doors with holes in it. In fact, Lewis Epps said it would never be replaced. Edwards Deposition (33, 48, 50). Instead, the door was caulked and covered with a towel, hardly a solution designed to bring permanent resolution to the problem or assure Tennessee that she was not being spied on as she was still required to shower in before beginning work. Furthermore, Murphy-Brown showed no interest in finding out if Salvador Hernandez or the other Mexicans had been spying on Tennessee and Edwards while they were showering. Tennessee and Edwards reported the peephole incident on January 24. But Murphy Brown did not question them until January 31, a week later and only after Tennessee and Edwards complained about how Murphy-Brown was handling the situation. Brooks (20-23). During that week period, Tennessee and Edwards were forced to carry on with work as usual as if nothing had happened. Tennessee Deposition 81-83.

And when Tennessee and Edwards went to farm headquarters to complain, they were not taken seriously. They were laughed at and told that they were the ones who put holes in the door. Edwards Deposition (61-62). And at the end of the day, Murphy-Brown did what it always did when it had a problem- swept the problem under the rug by transferring somebody. Edwards Deposition (44).

Finally, Murphy-Brown sought to suppress the truth about what was happening on its farms. After this lawsuit was filed, Emily Bunn threatened to fire anyone who talked about the incidents of harassment that occurred on the farms. And when Garrett and Nichols were going through the ordeal of having their panties masturbated in, Ken Bunn and Epps told them to keep quiet. Garrett Deposition 33.

Murphy-Brown is not entitled to summary judgment under this set of facts because they did not take reasonably effective remedial action. On a number of occasions, Murphy-Brown took no remedial action at all or waited an unreasonable amount of time to investigate the wrongdoing. On other occasions it transferred either the victim or the perpetrator, but failed to take proper remedial action because it conducted half-hearted investigations unlikely to reveal the truth- just asking the perpetrator if he did it or not. EEOC v. Sunbelt Rentals, Inc., 521 F.3d 306, 320 (4th Cir. 2008) ("Admittedly, there were corrective steps undertaken by Sunbelt…however, Riddlemoser and Dempster failed to take additional action that a rational juror might consider reasonably calculated to end the harassment. Instead, Dempster informed Ingram that everyone was "denying everything" and, thus, there was little he or Riddlemoser could do."). A rational jury could also conclude that Murphy-Brown treated complaints of sexual harassment as jokes and, therefore, sent the message that it was open season on their female employees. See Paroline v. Unisys Corp., 879 F.2d 100, 107 (4th Cir. 1989). And finally,

11

a rational jury could conclude that Murphy-Brown's attempts to suppress discussion of the incidents discouraged female workers from lodging complaints and made it easier for their male co-workers to harass them as they were less likely to receive third party discipline from entities such as the police.

**II.     Murphy-Brown is not entitled to summary judgment on Tennessee's retaliation claim.**

In order to have a claim under Title VII's retaliation provision, a plaintiff must demonstrate "that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).  The standard to be applied is the reasonable person (here, reasonable woman) standard.  The Court adopted the reasonable person standard because an "objective standard is judicially administrable.  It avoids the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings." Burlington Northern, Id. at 68-69.  What's more, and contrary to Murphy Brown's argument on brief, Murphy-Brown Memo at 28-30, in determining whether or not the retaliatory act is sufficient to dissuade the reasonable person from making a charge of discrimination, the evaluation is to be made in a vacuum, without reference to whether the retaliatory act is "more severe" than the discrimination being complained of. Id. at 69.

The fatal flaw Murphy Brown's argument is that it permits retaliation so long as the suffering caused by the retaliation does not exceed the suffering caused by the discrimination. An employer can get away with punishing an employee who reports discrimination as long as the employer does not punish her "too much".  The Supreme Court recognized this flaw in Burlington Northern and eliminated it by holding that courts and juries cannot consider whether

12

the retaliatory acts are "worse" than the discriminatory acts. Id. at 69. Their job is to answer whether a reasonable person would be deterred from reporting discrimination- regardless of type or severity- by the retaliatory acts of the employer. Whether an act is retaliatory, is judged by the severity of that act alone. See id.

Specifically, Justice Alito's concurrence in Burlington Northern took exception to the majority opinion's language that actionable retaliation occurs when "it well might dissuade an employee from making or supporting a charge of discrimination." Id. at 77 (Alito, J., concurring). He worried that under the standard "the degree of protection afforded to a victim of retaliation is inversely proportional to the severity of the original act of discrimination that prompted the retaliation." Id. at 78. In other words, an employee suffering great discrimination would be protected less than an employee suffering mild discrimination because the employer could take much stronger retaliatory action against her (the employee suffering great discrimination) before the retaliatory acts became more oppressive than the discrimination, and a retaliation claim accrued. Id. It would yield the perverse result that those already suffering greatly would have to suffer even more before bringing a retaliation claim. Id. at 77-78.

The majority dispelled Justice Alito's fears, and, in doing so, it destroyed Murphy Brown's argument that, in order for Tennessee to have a retaliation claim, the sexual harassment at Farm 7 must be greater than the sexual harassment at Farm 8. The majority held that the "dissuade an employee" standard "does *not* require a reviewing court or jury to consider the nature of the discrimination that led to the filing of the charge. Id. at 69 (majority opinion). Rather, "the standard is tied to the challenged retaliatory act, not the underlying conduct that forms the basis of the Title VII complaint." Id. It "focus[es] on the materiality of the challenged action and the perspective of a reasonable person in the plaintiff's position." Id.

13

Furthermore, upon Murphy-Brown's motion to dismiss in this case, this court said the following, if proven, would constitute a good claim of retaliation:

> Plaintiff ascribes to Epps a flippant and belittling demeanor as he refused to aid the women, deciding instead to reassign the Plaintiff to a farm where discrimination existed. Plaintiff expected to find the same or worse conditions at Farm 7, based on her awareness of conduct at Farms 6 and 8, which were under the management of Epps. Plaintiff also describes Epps' calculated power play designed to deter complaints and to keep the sexual harassment claims from reaching management at Human Resources. Additionally, Plaintiff implies that the reassignment was an implicit encouragement for the harassment to continue because Plaintiff and her co-worker would not be protected by Epps. Moreover, Plaintiff alleges that the reassignment was a ploy designed to get Plaintiff to quit her job.

<u>Tennessee v. Murphy-Brown, LLC</u>, No. 2:10cv167, slip op. at 7 (EDVA July 14, 2011). Tennessee has produced evidence to support these allegations, and made it possible for a rational jury to conclude that Murphy-Brown retaliated against her.

Specifically, Tennessee produced evidence that Epps was flippant and belittling in her January 31st meeting with him. He laughed at Tennessee and Edwards and accused them of putting the holes in the door. Edwards Deposition (61-62). Tennessee was aware of sexual harassment that had occurred on other farms under Epps' management and could safely assume that similar harassment existed on Farm 7. Tennessee Affidavit. Katrina Garrett verified that Murphy-Brown management at the farms, including Epps, tried to suppress complaints and wished to prevent anyone from learning about the incidents that occurred on the farms. Garrett Deposition (33). Tennessee also has evidence that reassigning her was implicit encouragement for the harassment to continue because Murphy-Brown <u>never</u> disciplined any of the perpetrators that harassed women on its farms and conspired to prevent victims from seeking help from others by threatening their jobs.

In short, Tennessee has produced evidence that supports a claim for retaliation as defined

by this court.

## Prayer for Relief

WHEREFORE Plaintiff Felicia D. Tennessee respectfully prays this court deny Defendant's Motion for Summary Judgment.

**FELICIA D. TENNESSEE**

_____/s/_____

Henry E. Howell, III
VSB #22274
THE EMINENT DOMAIN LITIGATION GROUP, P.L.C.
One East Plume Street
Norfolk, VA 23510
Telephone: (757) 446-9999
Facsimile: (757) 446-9008
heh@eminentdomaingroup.us
*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

       I hereby certify that on the 23rd day of September 2011, a true copy of the foregoing document was electronically filed with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

John M. Bredehoft
Mark E. Warmbier
KAUFMAN & CANOLES, P.C.
150 West Main Street, Suite 2100
Norfolk, VA 23510
757-624-3000
757-624-3169
jmbredehoft@kaufcan.com
mewarmbier@kaufcan.com
*Attorneys for Defendant*

Frank A. Edgar Jr.
KAUFMAN & CANOLES, P.C.
11815 Fountain Way, Suite 400
Newport News, VA 23606
757-873-6300
757-873-6359
faedgarjr@kaufcan.com
*Attorneys for Defendant*

                              _____/s/_____
                              Henry E. Howell, III (VSB #22274)
                              THE EMINENT DOMAIN LITIGATION GROUP, P.L.C.
                              One East Plume Street
                              Norfolk, VA 23510
                              Telephone: (757) 446-9999
                              Facsimile: (757) 446-9008
                              heh@eminentdomaingroup.us
                              *Attorneys for Plaintiff*

                              Henry L. Marsh, III (VSB # 05691)
                              Hill, Tucker & Marsh, PLLC
                              422 East Franklin Street, Suite 301
                              Richmond, Virginia 23219
                              Phone: (804-648-9074)
                              Facsimile: (804-648-2116)
                              htm@htm-law.com
                              *Attorneys for Plaintiff*